# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| ABRAHAM JOK, | No.  60685-2-II |
| Respondent, | |
| v. | |
| SAFELITE FULFILLMENT, INC., d/b/a SAFELITE AUTOGLASS, and JUSTIN LANINGHAM and "JANE DOE" LANINGHAM, husband and wife, both individually and on behalf of their marital community composed thereof, | UNPUBLISHED OPINION |
| Defendants, | |
| COZEN O'CONNOR, | |
| Appellant. | |

LEE, J. — Cozen O'Connor (Cozen), the law firm representing Safelite Fulfillment, Inc. (Safelite), appeals the superior court's order imposing a $1 million discovery sanction for violation of CR 26(g).  Specifically, Cozen argues that its conduct was not sanctionable, and even if it was, the superior court's imposition of a $1 million sanction was excessive.

Because Cozen failed to make a reasonable inquiry regarding Safelite's insurance policies, we affirm the superior court's ruling that Cozen had violated CR 26(g) and was subject to sanctions.  However, because the $1 million sanction was not compensatory and because the superior court failed to consider the least severe sanction that would still educate, deter, and punish

No. 60685-2-II

Cozen, we reverse the amount of sanction imposed and remand to the superior court for further consideration.

FACTS

A.    BACKGROUND

In September 2020, Abraham Jok sustained injuries in a multiple-vehicle car accident involving a vehicle owned by Safelite and driven by Safelite employee, Justin Laningham. Shortly thereafter, Jok filed a personal injury action against Safelite and Laningham (collectively, Safelite). Safelite retained Robert Lee of Cozen as counsel.

1.    Discovery

On December 15, 2021, Lee sent an email request to Sedgwick, Safelite's third-party administrator for Safelite's insurance policies, asking for a copy of the applicable insurance policy for the matter. Lee's email stated:

> When you get the chance, could you forward the applicable policy for this matter?
> Thank you!

Clerk's Papers (CP) at 45. According to Lee, he requested the insurance policy in anticipation that Safelite and Laningham would be asked for copies of any applicable insurance policies during discovery.

On December 23, Jok sent his first set of interrogatories and requests for production (RFPs) to Cozen. However, Jok's discovery request was directed to Laningham only. Interrogatory No. 27 stated:

> Do any insurance or indemnification policies exist that may satisfy part or all of a judgment that may be entered in this action; or to indemnify or reimburse for payments made to satisfy such judgment? If so, please state as to each insurance agreement or policy its complete contents, including:

2

> (a) Name, address and telephone number of insurer or indemnitor;
> (b) Name, address and telephone number of each named insured or indemnitee;
> (c) Each type of coverage provided;
> (d) Limits of each type of coverage provided;
> (e) Amount of deductible as to each coverage;
> (f) Policy period coverage;
> (g) Policy number.
> **NOTE:** This interrogatory may be responded to by producing a complete copy of the declaration page of each insurance agreement or policy.

CP at 55. RFP No. 7 requested the "[t]rue and correct copy of each insurance policy and declaration sheet referred to in Interrogatory No. 27." CP at 57.

That same day, Lee again emailed Sedgwick, attaching Jok's interrogatories and RFPs, and stated:

> We have been served with discovery requests in this case. As part of our responses we will need to produce the applicable policy.
> Could you send over when you get the chance? Thanks!

CP at 61.

On December 28, Sedgwick provided a copy of a 2020 CHUBB/ACE American Insurance Company (CHUBB) auto policy with Safelite listed as the insured and a $5 million liability limit. Sedgwick's email response to Lee stated:

> Good Afternoon,
>
> Attached please find the 2020 auto policy.
>
> . . . .
>
> Sedgwick manages claims on behalf of [CHUBB/]ACE American Insurance Company for this claim.

CP at 63.

On March 14, 2022, Safelite served its answers to Jok's interrogatories and RFPs via email and attached a copy of the CHUBB policy declaration pages. Lee certified the discovery responses as being in conformance with CR 26(g). Neither Laningham nor Safelite signed the discovery responses.

In June 2024, the parties engaged in an unsuccessful mediation. Discovery closed on June 17, 2024. Trial had originally been set to begin on August 5, 2024. However, on July 31, 2024, the superior court informed the parties the trial date would need to be continued. Trial was subsequently rescheduled to begin December 9, 2024.

2.      Travelers Excess Policy

On August 1, 2024, Lee received an email from Travelers Property Casualty Company of America (Travelers), stating that Safelite had put it on notice of Jok's claim. Travelers informed Lee that Safelite had an "Excess Follow Form and Umbrella Liability Insurance Policy" through Travelers for $25 million. CP at 92. Travelers did not provide a copy of the policy in this communication. According to Lee, this was the first that he or Cozen had learned of the existence of any such policy. Lee did not disclose the existence of the Travelers policy to Jok in August 2024 due to an "inadvertent error." CP at 41.

On November 15, 2024, Jok sent a "Time Limited Policy Limit Demand" to Safelite. CP at 249. Jok stated that he intended to ask the jury for a verdict in the "tens of millions," but was willing settle and release his claims "in exchange for tender of the policy limits in the amount of $5 million." CP at 249. Jok's policy limit demand was based on the $5 million CHUBB policy. Safelite's immediate response was a request for more time to review the "policy limits demand." CP at 252. Eventually, Safelite rejected the demand.

On December 5, Lee "realized that despite having become aware of the existence of the [Travelers] excess policy on August 1, 2024, [he] had not obtained and produced a copy of the policy or the declarations page to" Jok. CP at 41. That same day, Sam Cayton, an associate attorney at Cozen, requested a copy of Safelite's Travelers policy from Travelers.

On the morning of December 6, Travelers forwarded a copy of the policy. Cayton sent the policy to Jok's counsel via email. Cayton's email contained the subject line, "Jok v. Safelite—Policy," and his email stated:

> Good morning, Counsel, attached to this email is a copy of an excess policy from Travelers that we received today. If you have any issues with accessibility, please do not hesitate to reach out to us.

CP at 99. Jok's counsel did not receive the December 6 email from Cayton. According to Lee, he had no reason to believe that Jok's counsel had not received Cayton's email.

3. Trial

Trial commenced on December 9. At issue in the trial was the nature and extent of Jok's injuries and the damages amount.[1] Jok requested a $25 million verdict. Throughout trial, Safelite and Jok continued attempts to settle. After unsuccessful settlement negotiations, Safelite offered to settle for $5 million. Jok rejected the offer.

On December 17, during the second week of trial, Lee, Jok's counsel, and Travelers had a telephone conference regarding potential settlement. It was during that phone call that Jok's counsel learned of the Travelers policy and stated that he never received a copy of the Travelers policy. According to Jok's counsel, neither he nor anyone in his office received the December 6

---

[1] Safelite admitted liability for the collision and that Jok had sustained a cervicothoracic trapezius strain from the collision.

email from Cayton. Lee then emailed Jok's counsel, attaching the December 6 email with the Travelers policy attached. Lee also uploaded the policy and Cayton's email to a file-sharing program to ensure Jok's counsel's receipt. Jok's counsel received the copy of the Travelers policy that Lee sent on December 17.

On December 19, the case went to the jury for deliberation. The jury returned a verdict of $11.25 million in favor of Jok.

B.    MOTION FOR SANCTIONS

On January 7, 2025, Jok filed a motion for sanctions against Safelite for "failing to disclose a $25 million coverage policy until one week before trial—nearly three years after [Jok]'s discovery request." CP at 1. Jok requested "significant" monetary sanctions "in an amount left to the discretion of the Court" and paid to a charity. CP at 3.

Safelite, still represented by Lee and Cozen, opposed the sanctions, arguing in part that Jok suffered no prejudice. Additionally, Safelite emphasized that the Travelers policy was provided to Jok "*immediately upon receipt and prior to trial.*" CP at 5 (emphasis in original).

1.    January 17, 2025 Hearing

On January 17, the superior court held a hearing for the presentation of judgment and heard Jok's motion for sanctions.[2] On the sanctions motion, Jok's counsel argued that Cozen failed to make a reasonable inquiry under CR 26(g) regarding Safelite's insurance policies. Jok's counsel

---

[2] The January 17, 2025 hearing also included discussion of other motions, including a motion for a mistrial and a motion for revision, both filed by Safelite. Neither the motion for a mistrial nor the motion for revision are the subject of this appeal.

further argued that the failure to conduct a reasonable inquiry was prejudicial insofar as Jok's

knowledge of only the $5 million CHUBB policy influenced Jok's trial strategy decisions.

Jok's counsel then addressed the standard for CR 26 sanctions under *Fisons*.[3]

> Again, in *Fisons*, the court adopted Rule 26(g) in order to provide a deterrent to discovery abuse as well as an impetus for candor and reason in [the] discovery phase of litigation.

> And then in *Fisons* they talk about what should the sanction be and who should it be against, because it could be against the attorney, it could be against the party or both. And in this case, probably both because the attorney has to do the reasonable inquiry. They don't get to sit on [their] hands and say, "We've given you everything we have." That's not how discovery works.

> And then *Fisons* says, "The sanction needs to be severe enough to deter attorneys and others from participating in this kind of conduct but not small enough that it won't have the desired effect."

> So it's got to be a big sanction, especially when you're dealing with a company like Safelite. Safelite is a national company in all 50 states. Justin Laningham, their employee, testified to that. We didn't have evidence of this, but I looked on the internet and it says the revenue is over $2 billion a year. So what does it take. How much does it take in order for Safelite—in order for the big law firms involved here to say, "Ouch, maybe we shouldn't do that again."

> $25 million in coverage that they get. Maybe it's a thousand dollars per million that they didn't disclose. I don't know. It could be much higher because there's probably 25,000 in revenue every hour for Safelite. I don't know. I leave that to the discretion of the Court.

Verbatim Rep. of Proc. (VRP) (Jan. 17, 2025) at 34-35. Finally, Jok's counsel noted that Safelite

had exhibited a "pattern" of failing to disclose evidence through the litigation. VRP (Jan. 17,

2025) at 35.

---

[3] *Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 122 Wn.2d 299, 343, 858 P.2d 1054 (1993).

In response, Safelite argued that CR 37 should be the basis for "this type of discovery issue post-trial," that Jok made "speculative assertions" about Safelite's timing of disclosures, and it was "undisputed that [Safelite] provided the Traveler's [sic] policy to [Jok] and [Jok] had it throughout trial." VRP (Jan. 17, 2025) at 39. Additionally, Safelite noted that Jok did not cite any specific costs resulting from any discovery violation, and that asking for a donation to a charity was "outside the bounds of CR 37(d)." VRP (Jan. 17, 2025) at 40.

The superior court reviewed Jok's sanctions motion under CR 26(g).[4] The superior court noted that because the matter was post-trial and that Jok prevailed, "things like defaults and striking responses at this point would not be helpful." VRP (Jan. 17, 2025) at 43. The superior court found

---

[4] CR 26(g) provides in part:

> Every request for discovery or response or objection thereto made by a represented party shall be signed by at least one attorney of record in the attorney's name. . . . The signature of the attorney or party constitutes a certification that the attorney or the party has read the request, response, or objection, and that to the best of their knowledge, information, and belief formed after a reasonable inquiry it is:
>
> (1) consistent with these rules and warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law;
>
> (2) not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation; and
>
> (3) not unreasonable or unduly burdensome or expensive, given the needs of the case, the discovery already had in the case, the amount in controversy, and the importance of the issues at stake in the litigation. . . .
>
> If a certification is made in violation of the rule, the court, upon motion or upon its own initiative, shall impose upon the person who made the certification, the party on whose behalf the request, response, or objection is made, or both, an appropriate sanction, which may include an order to pay the amount of the reasonable expenses incurred because of the violation, including a reasonable attorney fee.

that there had not been a reasonable inquiry regarding Safelite's insurance policies, in violation of

CR 26(g). The superior court stated:

> I'm finding there has not been a reasonable inquiry so, therefore, there was a violation of CR 26(g) and, therefore, I have authority to impose sanctions.
>
> In this case, I'm going to impose it on counsel and the party, Safelite, because I think both had a responsibility to respond correctly to make an inquiry and respond correctly to the discovery request. If that had been done, this excess policy would have been found and it could have been disclosed to the plaintiff long before trial.
>
> So the question is, what kind of sanction would be effective. The Court recognizes that this is something that has broader implications. . . . And so I feel like in exercising my discretion, I need to go beyond simple attorneys [sic] fees or costs. I think this is a bigger issue than that.
>
> This is an issue where a party did not look for a policy which their client or the attorney should easily have found and it was not disclosed until just before trial. That cannot be tolerated, if we are to follow the spirit of discovery, as the *Fisons* decision says.
>
> And so what I'm going to do is order that counsel and Safelite make a payment to the Red Cross in the amount of $1 million. This is a mere 1/25th of the value of the policy that was not disclosed. It is less than ten percent of the verdict. And I think that is appropriate for a sanction in this case.

VRP (Jan. 17, 2025) at 43-44.

On January 31, Lee and Cozen withdrew as counsel for Safelite. Safelite retained the firm

Carney Badley Spellman as its new counsel.

2.      Discovery of Everest National Policy

On February 4, 2025, the law firm Talmadge/Fitzpatrick entered a notice of appearance

representing Cozen. Then, later that day, Carney Badley Spellman sent a letter to Jok's counsel.

The letter threatened CR 11 sanctions against Jok for "serious, material misstatements in

the sanctions motion." CP at 176. Specifically, when Jok propounded his first interrogatories and

RFPs requesting insurance information, that request was directed only to Laningham and not specifically to Safelite. Carney Badley Spellman stated, "No discovery requests sought insurance information from Safelite," and thus, Safelite did not have an obligation to respond fully to the insurance interrogatory. CP at 176. Accordingly, "[s]anctions against Safelite [were] not available under CR 26(g)."[5] CP at 177.

Carney Badley Spellman's letter then disclosed that Safelite held an additional $25 million insurance policy issued by Everest National "on top of the $25 million Travelers policy." CP at 177.

On February 7, Jok's counsel filed a letter with the superior court. The letter acknowledged that Jok's motion for sanctions had incorrectly stated that the insurance discovery request was served on the "'Defendants.'" CP at 308. The letter also stated that the insurance request had been directed to Laningham only, and not to Safelite. Jok's counsel wrote: "To be clear, there was no separate discovery request to Safelite regarding insurance—only Laningham. This will likely alter the Court's reasoning for imposing sanctions on Safelite. Therefore, we have submitted a second revised order to reflect what we anticipate will be a likely change in the Court's order." CP at 308.

The February 7 letter also noted the discovery of the Everest National policy and that a "second undisclosed policy, disclosed after trial, and not disclosed while [Jok]'s motion was pending, provides basis for imposing sanctions." CP at 308.

---

[5] The parties had previously agreed that sanctions against Laningham individually were unwarranted because he had not signed his discovery responses and he lacked independent knowledge of the insurance coverage.

3.      March 7, 2025 Hearing

The parties readdressed Jok's motion for sanctions in light of the newly discovered Everest National policy and Carney Badley Spellman's February 4 letter. Jok withdrew his motion as to Safelite. Jok's counsel again argued that Lee and Cozen failed to conduct a reasonable inquiry, without explanation, and that Cozen had exhibited a pattern of failing to disclose and produce evidence throughout the litigation. In response, Cozen argued there was no "willful, deliberate, . . . failure to turn over materials" and faulted Sedgwick for failing to provide all of the applicable insurance policies. 1 VRP (Mar. 7, 2025) at 63. Cozen further asserted that Jok failed to establish prejudice, and even if there had been prejudice, Jok failed to mitigate any prejudice.

The superior court again reviewed the sanctions motion under CR 26 and found that Cozen failed to conduct a reasonable inquiry. The superior court stated:

> Here we have a very well respected law firm, which is experienced in the area of defense work, accustomed to working with adjusters, accustomed to looking at policies.
>
> I don't know that I've heard the exact explanation for how not one but two $25 million policies went undiscovered until, in the case of the last one, after trial.
>
> The Court's concern about this, assuming for a moment that this was just a mistake, either by an attorney or maybe an adjuster, if there is no meaningful sanction, which is required under the rule, this could easily become routine to say that it's just a mistake, no harm, no foul.
>
> And it's particularly egregious because this is information that only the insurance company controls. The plaintiff has no other way of getting it other than through a discovery request. And if the court doesn't require that there be reasonable inquiries into what policies there may be to satisfy a judgment, what is the incentive to produce those policies.
>
> . . . .

11

And so based on CR 26(g) I'm required to impose sanctions if I find the inquiry was not reasonable. I think I've already explained this, but I do believe that it was not reasonable. It's unreasonable not to locate one of the $25 million policies, but now we have two.

So the Court is not going to change its sanctions award in the amount, I should say. I will ask that we take out the names of folks who are not going to be responsible for this. I think that just leaves Cozen and O'Connor. And I'll leave it at that.

1 VRP (Mar. 7, 2025) at 78-77.

The superior court upheld the $1 million sanction, but against Cozen only. The superior

court's written order stated in part:

As to the appropriate sanction, we are now post-trial and [Jok] has obtained a favorable verdict, so a sanction of a default judgment or striking a response would not be helpful. An award of attorneys' fees and costs would not be sufficient, nor has [Jok] requested attorneys' fees or costs or even that the sanctions be paid to him.

This is an issue where defense counsel did not look for a policy which they would easily have found and it was not disclosed until just before trial. Even more coverage was not disclosed until after trial. That cannot be tolerated. If we are to follow the guidance of *Fisons* and progeny, then the sanction[] needs to be severe enough to prevent this kind of conduct in the future. The Court therefore imposes a $1 million sanction against Cozen O'Connor to be paid to the American National Red Cross. This is 1/50th of the value of the policies that were not disclosed. It is less than ten percent of the verdict. The Court finds that this is an appropriate sanction for the circumstances of this case.

CP at 265-66.

Cozen appeals.

## ANALYSIS

Cozen argues that its attorneys did not violate CR 26(g) because they conducted a

reasonable inquiry regarding Safelite's insurance policies, and even if there was a violation of CR

26, the $1 million sanction was excessive.[6] We hold that Cozen failed to conduct a reasonable inquiry in violation of CR 26(g) and that sanctions were appropriate. However, we hold that the superior court abused its discretion when it levied a $1 million sanction against Cozen.

A.    STANDARD OF REVIEW

"'The purpose of sanctions orders are to deter, to punish, to compensate[,] and to educate.'" *King County v. Aquatherm GmbH*, 36 Wn. App. 2d 410, 438, 586 P.3d 1029 (2026) (alteration in original) (quoting *Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 122 Wn.2d 299, 356, 858 P.2d 1054 (1993)), *petition for review filed*, No. 105286-3 (Apr. 22, 2026). Trial courts have broad discretion when imposing discovery sanctions under CR 26 and CR 37. *Mayer v. Sto Indus., Inc.*, 156 Wn.2d 677, 684, 132 P.3d 115 (2006); *see* CR 26, CR 37. Thus, appellate courts will not disturb a trial court's imposition of sanctions absent an abuse of discretion. *Magaña v. Hyundai Motor Am.*, 167 Wn.2d 570, 582, 220 P.3d 191 (2009).

"'A trial court abuses its discretion when its order is manifestly unreasonable or based on untenable grounds.'" *Id.* (quoting *Fisons*, 122 Wn.2d at 339). "A discretionary decision rests on 'untenable grounds' . . . if the trial court relies on unsupported facts or applies the wrong legal standard; the court's decision is 'manifestly unreasonable' if 'the court, despite applying the correct legal standard to the supported facts, adopts a view that no reasonable person would take.'" *Mayer*, 156 Wn.2d at 684 (internal quotation marks omitted) (quoting *State v. Rohrich*, 149 Wn.2d

---

[6] Even though Jok's interrogatories and RFPs were directed to Laningham only, the discovery request asked for "*any* insurance or indemnification policies . . . that may satisfy part or all of a judgment that may be entered in this action." CP at 55 (emphasis added). Thus, because Laningham was acting in the course of his employment with Safelite at the time of the car accident, Safelite's insurance policies were implicated.

647, 654, 71 P.3d 638 (2003)).  A trial court should state on the record its reasons for imposing discovery sanctions.  *Magaña*, 167 Wn.2d at 583.

B.      BASES FOR DISCOVERY SANCTIONS

1.      Legal Principles

Discovery is broad in scope.  *Cedell v. Farmers Ins. Co. of Wash.*, 176 Wn.2d 686, 695, 295 P.3d 239 (2013).  "'The right to discovery is an integral part of the right to access the courts embedded in our constitution.'"  *Aquatherm*, 36 Wn. App. 2d at 437 (quoting *Cedell*, 176 Wn.2d at 695).  "'[E]arly open discovery . . . promotes the efficient and prompt resolution of meritorious claims and the efficient elimination of meritless claims.'"  *Id.* at 438 (internal quotation marks omitted) (quoting *Cedell*, 176 Wn.2d at 695).

a.      CR 26(g) Sanctions

CR 26(g) requires that attorneys responding to discovery requests certify they have read the discovery responses and after reasonable inquiry, believe the responses are consistent with the discovery rules, "not interposed for any improper purpose," and "not unreasonable or unduly burdensome or expensive, given the needs of the case, the discovery already had in the case, the amount in controversy, and the importance of the issues at stake in the litigation."  CR 26(g)(1)-(3); *Aquatherm*, 36 Wn. App. 2d at 438; *Fisons*, 122 Wn.2d at 343.  "[L]ike CR 11, CR 26(g) is aimed at reducing delaying tactics, procedural harassment and mounting legal costs."  *Fisons*, 122 Wn.2d at 341.  CR 26(g) further provides:

> If a certification is made in violation of the rule, the court, upon motion or upon its own initiative, shall impose upon the person who made the certification . . . an appropriate sanction, which may include an order to pay the amount of the reasonable expenses incurred because of the violation, including a reasonable attorney fee.

14

Whether an attorney has conducted a reasonable inquiry is judged by an objective standard. *Aquatherm*, 36 Wn. App. 2d at 438. "[T]he court should consider all of the surrounding circumstances, the importance of the evidence to its proponent, and the ability of the opposing party to formulate a response or to comply with the request." *Fisons*, 122 Wn.2d at 343. A subjective belief of compliance with CR 26 or good faith will not shield an attorney from sanctions. *Id.* Indeed, a party who has responded to a discovery request has a duty to "seasonably supplement or correct that response with information thereafter acquired" and "[f]ailure to seasonably supplement or correct in accordance with this rule will subject the party to such terms and conditions as the trial court may deem appropriate." CR 26(e).

Courts have wide latitude to fashion an appropriate sanction. *Aquatherm*, 36 Wn. App. 2d at 442. In *Fisons*, the Washington Supreme Court articulated principles to guide a court's consideration of an appropriate sanction:

> First, the least severe sanction that will be adequate to serve the purpose of the particular sanction should be imposed. The sanction must not be so minimal, however, that it undermines the purpose of discovery. The sanction should insure that the wrongdoer does not profit from the wrong. The wrongdoer's lack of intent to violate the rules and the other party's failure to mitigate may be considered by the trial court in fashioning sanctions.
>
> . . . Where compensation to litigants is appropriate, then sanctions should include a compensation award. However, we caution that the sanctions rules are not "fee shifting" rules. Furthermore, requests for sanctions should not turn into satellite litigation or become a "cottage industry" for lawyers. To avoid the appeal of sanctions motions as a profession or profitable specialty of law, we encourage trial courts to consider requiring that monetary sanctions awards be paid to a particular court fund or to court-related funds.

122 Wn.2d at 355-56 (internal citations omitted). While a court may consider a party's intent to engage in discovery violations, under CR 26(g), a showing of intent is not required before

mandating sanctions. *Mayer*, 156 Wn.2d at 689. "The discovery sanction should be proportional to the discovery violation and the circumstances of the case." *Magaña*, 167 Wn.2d at 590.

   b.  CR 37 Sanctions

  CR 37 allows a trial court to impose sanctions when a party fails to follow a discovery order. CR 37(b)(2); *Aquatherm*, 36 Wn. App. 2d at 438. CR 37(b) provides a nonexclusive list of possible sanctions, "including designating facts as established, striking claims or defenses, limiting or prohibiting evidence, default, and contempt." *Aquatherm*, 36 Wn. App. 2d at 442; *see* CR 37(b)(2). Additionally, monetary sanctions may be awarded in lieu of or in addition to the sanctions described in CR 37(b)(2)(A)-(E). *Mayer*, 156 Wn.2d at 689; CR 37(b)(2).

  If a trial court decides to impose one of the "harsher remedies" allowable under CR 37(b)—or sanctions that affect a party's ability to present its case—it must consider the factors laid out in *Burnet*, known as the *Burnet* factors. *Burnet v. Spokane Ambulance*, 131 Wn.2d 484, 494, 933 P.2d 1036 (1997); *Aquatherm*, 36 Wn. App. 2d at 442; *Mayer*, 156 Wn.2d at 690. "'[I]t must be apparent from the record that the trial court explicitly considered whether a lesser sanction would probably have sufficed,' and whether it found that the disobedient party's refusal to obey a discovery order was willful or deliberate and substantially prejudiced the opponent's ability to prepare for trial." *Burnet*, 131 Wn.2d at 494 (quoting *Snedigar v. Hodderson*, 53 Wn. App. 476, 487, 768 P.2d 1 (1989), *aff'd in part and rev'd in part on other grounds*, 114 Wn.2d 153 (1990)). The party seeking the imposition of the sanction bears the burden of establishing "that the violation was willful or deliberate and that the violation substantially prejudiced that party's ability to prepare for trial." *Carroll v. Akebono Brake Corp.*, 22 Wn. App. 2d 845, 864, 514 P.3d 720 (2022), *review denied*, 200 Wn.2d 1023 (2023).

A *Burnet* analysis, however, "does not encompass monetary compensatory sanctions under CR 26(g) or CR 37(b)(2)." *Mayer*, 156 Wn.2d at 690. The Washington Supreme Court stated in *Mayer*:

> [T]he *Burnet* factors make little sense in the context of a compensatory award: the trial court's calculation of a compensatory award will necessarily involve consideration of greater and lesser amounts; the willfulness of the offending party . . . does not change the amount needed to compensate the wronged party; and incurring attorney fees because of discovery abuse is by definition prejudicial and can, in extreme cases, make litigation prohibitively expensive.

*Id.*

2. Superior Court's CR 26(g) Violation Ruling

Cozen argues that Lee[7] made a "reasonable effort to comply" with Jok's interrogatory and RFP requesting insurance information when Lee contacted Sedgwick for the applicable policy.[8] Br. of Appellant at 36. Cozen asserts that Lee's failure to obtain all of the policies was at most a "mistake" and "not a deliberate withholding of the policies at issue." Br. of Appellant at 37. Jok argues that Cozen provided no explanation for its failure to discover and produce the Travelers policy and Everest National policy during the discovery period. Moreover, Jok asserts, Lee failed to "clearly inform [Safelite and Sedgwick] precisely what discovery [was] being sought," as evidenced by Lee's emails to Sedgwick and the subsequent discovery of the Everest National

---

[7] While Lee was not sanctioned personally, we refer to him individually as he was the Cozen attorney in communication with various parties.

[8] We note that Cozen's briefing states, "Lee made the early request of Sedgwick for *any policy applicable* to Safelite even before formal discovery requests from Jok and provided Jok the policy given to him by Sedgwick." Br. of Appellant at 36 (emphasis added). This assertion is belied by the record, which shows that Lee requested "*the* applicable policy" from Sedgwick. CP at 45 (emphasis added).

policy two months post-trial. Br. of Resp't at 31. We agree that Cozen failed to conduct a reasonable inquiry in violation of CR 26(g).

The record shows that Lee twice requested "the" applicable insurance policy from Sedgwick—once before Jok propounded his first set of interrogatories and RFPs and once after. CP at 45, 61. Sedgwick provided the $5 million CHUBB policy. Cozen produced the CHUBB policy to Jok as part of Safelite's discovery responses. Lee did not inquire about any additional policies to Sedgwick, nor did Jok send additional discovery requests regarding insurance.

In determining whether Cozen conducted a reasonable inquiry, courts consider the surrounding circumstances, the importance of the evidence, and the ability of the party to comply with the request. *Fisons*, 122 Wn.2d at 343. Here, Cozen's ability to request the relevant insurance information from Safelite via Sedgwick appears to have been easily done, as shown by the quick, rather informal emails Lee sent to Sedgwick and Sedgwick's prompt response.

In both emails to Sedgwick, Lee requested the applicable policy in the singular. Lee's second email to Sedgwick was brief and stated:

> We have been served with discovery requests in this case. As part of our responses we will need to produce *the applicable policy*.
> Could you send over when you get the chance? Thanks!

CP at 61 (emphasis added). The record shows that Lee attached a copy of the interrogatories and RFPs to his email. However, Lee did not direct Sedgwick to the specific interrogatory or RFP regarding insurance policies, nor did Lee use the language of the interrogatory. Sedgwick replied with a copy of the CHUBB policy in an email that stated:

> Good Afternoon,

> Attached please find the 2020 auto policy.

18

. . . .

> Sedgwick manages claims on behalf of [CHUBB/]ACE American Insurance Company for this claim.

CP at 63. Sedgwick complied with Cozen's request. But, of note, Sedgwick's email response contained a qualifier: "Sedgwick manages claims *on behalf of [CHUBB/]ACE American Insurance Company for this claim*." CP at 63 (emphasis added). Thus, the implication is that Sedgwick provided the policy it had access to—the $5 million CHUBB policy—because it only managed the CHUBB policy.

Cozen argues it was entitled to rely upon Sedgwick, "an experienced risk/claims management firm." Br. of Appellant at 23. In fairness to Cozen, assuming Safelite had directed Cozen to communicate with Sedgwick regarding its insurance policies,[9] it was not inappropriate for Cozen to rely on Sedgwick. Moreover, the qualifier in Sedgwick's email gives no indication of whether Safelite had additional insurance policies beyond those that Sedgwick managed on its behalf.

However, the record also shows that on August 1, 2024, Lee became aware of the $25 million Travelers policy. Lee was notified by Travelers directly, *not* by Sedgwick or Safelite. This should have put Cozen on notice that additional insurance policies, and perhaps ones not managed by Sedgwick, may have existed. At the very least, Cozen could have reached out to Sedgwick or Safelite to confirm. The record contains no evidence that it did so; indeed, in a declaration, Lee

---

[9] The record does not contain any communications between Cozen and Safelite, nor does the record contain any evidence that Cozen *confirmed* the discovery responses with Safelite.

admitted to doing nothing with the information for months, claiming an "inadvertent error." CP at 41.

Then, in November 2024, less than a month before trial, Jok sent a "Time Limited Policy Limit Demand." CP at 249. Jok offered to "settle his case and sign a release of all claims in exchange for tender of the *policy limits* in the amount of $5 million." CP at 249 (emphasis added). The demand letter also referenced CHUBB/ACE American Insurance Company. CP at 250. Thus, there can be no doubt that Jok made an offer based only on the CHUBB policy. *Even then*, Cozen did not inquire with Sedgwick or Safelite regarding other possible insurance policies nor did Lee inform Jok of the existence of the Travelers policy. Only on December 5, four days before trial, did Lee "realiz[e]" his error. CP at 41.

Cayton emailed Travelers near the end of the business day on December 5, requesting a copy of the Travelers policy. Travelers responded with a copy of the policy *before 8 a.m. the next morning*, showing that the policy was easily obtained. Cayton forwarded a copy of the Travelers policy to Jok's counsel in an email, which stated: "Good morning, Counsel, attached to this email is a copy of an excess policy from Travelers that we received today."[10] CP at 99.

After the superior court imposed sanctions against Safelite and Cozen for violation of CR 26(g) in post-trial proceedings, Safelite's new counsel at Carney Badley Spellman disclosed the $25 million Everest National policy. Carney Badley Spellman had been retained *less than a month*

---

[10] We note that given the time that elapsed between Cozen's discovery of the Travelers policy and its disclosure and production of the policy to Jok, there has been a clear violation of CR 26(e). Moreover, aside from the fact that Cayton's email speciously implies Cozen had only just learned of the Travelers policy in December 2024, the record also shows that Cozen made no effort to confirm that Jok's counsel received Cayton's email on December 6.

prior to discovery of the Everest National policy. Carney Badley Spellman's short tenure as Safelite's counsel prior to the disclosure of the Everest National policy suggests that the Everest National policy was also easily obtained. The record contains no explanation as to why Cozen, serving as Safelite's counsel for *years* throughout litigation in this matter, did not learn of the Everest National policy.

The record also shows that the insurance information was important for Jok's trial strategy, trial budget, and settlement negotiations. As the superior court noted:

> And it's particularly egregious because this is information that only the insurance company controls. The plaintiff has no other way of getting it other than through a discovery request. And if the court doesn't require that there be reasonable inquiries into what policies there may be to satisfy a judgment, what is the incentive to produce those policies.

1 VRP (Mar. 7, 2025) at 78.

Considering the surrounding circumstances, including the years of litigation in this matter, the importance of the insurance policy information to Jok's trial strategy and settlement negotiations, as well as how easily obtainable the two $25 million policies appeared to be, we hold that the superior court did not abuse its discretion when it determined that Cozen failed to conduct a reasonable inquiry in violation of CR 26(g). *Fisons*, 122 Wn.2d at 343. CR 26(g) mandates sanctions for such violations; thus, we affirm the superior court's determination that sanctions were warranted.

3.      $1 Million Sanction was an Abuse of Discretion

Cozen argues that even if its conduct was sanctionable, the superior court abused its discretion when it levied a $1 million sanction against Cozen. Specifically, Cozen asserts that because Jok failed to establish prejudice and Cozen did not intentionally withhold the insurance

21

policies, the sanction was disproportionate to the discovery violation. Conversely, Jok argues that the superior court appropriately considered the least severe sanction that would be adequate to "educate and deter" future similar discovery violations. Br. of Resp't at 38. We agree with Cozen that the superior court abused its discretion when it imposed a $1 million sanction.

The superior court has wide latitude to fashion an appropriate sanction. *Aquatherm*, 36 Wn. App. 2d at 442. *Fisons* provides that "the least severe sanction that will be adequate to serve the purpose of the particular sanction should be imposed." 122 Wn.2d at 355-56. However, "[t]he sanction must not be so minimal, however, that it undermines the purpose of discovery" and "[t]he sanction should insure that the wrongdoer does not profit from the wrong." *Id.* at 356.

The record shows that the superior court initially contemplated the $1 million sanction against both Cozen *and* Safelite. The superior court considered other sanctions and stated: "I recognize that we are post-trial, that [Jok] was lucky and won the case, and so things like defaults and striking responses at this point would not be helpful." VRP (Jan. 17, 2025) at 43. The superior court then turned to monetary sanctions.

The record also shows that the $1 million sanction was not tied to any damages suffered or costs expended by Jok. During the January 17 hearing, Jok's counsel stated: "We're not asking for any of that money to go to us. I didn't ask you for attorney's fees." VRP (Jan. 17, 2025) at 34. In its order imposing sanctions, the superior court stated: "An award of attorneys' fees and costs would not be sufficient." CP at 265. Thus, the sanction was not compensatory. *See Mayer*, 156 Wn.2d at 690. In the sanctions order, the superior court further wrote:

> This is an issue where defense counsel did not look for a policy which they would easily have found and it was not disclosed until just before trial. Even more coverage was not disclosed until after trial. That cannot be tolerated. If we are to

follow the guidance of *Fisons* and progeny, then the sanction[] needs to be severe enough to prevent this kind of conduct in the future.

CP at 266.

Accordingly, the $1 million sanction is more accurately characterized as a punitive. The question then becomes how this court reviews punitive discovery sanctions or if punitive monetary sanctions should be viewed differently than compensatory sanctions under CR 26(g).

The parties advance different approaches. Cozen urges this court to apply the *Burnet* factors to such an "'onerous'" sanction, arguing that the sanction must be proportional to the violation, which necessitates consideration of prejudice and intent. Br. of Appellant at 26. Jok asserts that the superior court's sanction was faithful to *Fisons* and that the superior court appropriately "took into consideration the importance of fashioning a remedy that would educate and deter." Br. of Resp't at 38. Jok further responds that the *Burnet* analysis required for CR 37 violations, including an assessment of prejudice, is not applicable to monetary sanctions under CR 26.

Cozen attempts to inject a CR 37 standard—in other words, the *Burnet* test—into consideration of a CR 26(g) violation, but *Mayer* makes clear that neither the *Burnet* test, nor CR 11, has any applicability to sanctions imposed under CR 26(g). *Mayer*, 156 Wn.2d at 689. *Mayer* reiterates the Washington Supreme Court's language in *Fisons*, distinguishing between CR 37, CR 26, and CR 11. *Id.* Specifically, *Mayer* stated:

> "[T]he sanctions provisions of CR 37 do not apply where, as here, the more specific sanction rule better fits the situation. . . . Because CR 26(g), the discovery sanctions rule, was adopted to specifically address the type of conduct involved here, it, rather than CR 11, CR 37 or the inherent power of the court, is applicable in the present case."

*Id.* (alterations in original) (quoting *Fisons*, 122 Wn.2d at 340).[11] Thus, we reject Cozen's attempt to raise a CR 37 standard within our consideration of Cozen's CR 26(g) violation. Under *Mayer*, CR 37 simply does not apply here.

Under *Fisons*, "the least severe sanction that will be adequate to serve the purpose of the particular sanction should be imposed." 122 Wn.2d at 355-56. Further, CR 26(g) does not confine a trial court's discretion to sanctioning *only* in the amount of costs or reasonable attorney fees. Rather, the rule suggests that costs and fees as a potential sanction be based on the harm incurred *because of the violation*:

> If a certification is made in violation of the rule, the court, upon motion or upon its own initiative, shall impose upon the person who made the certification, the party on whose behalf the request, response, or objection is made, or both, an appropriate sanction, which may include an order to pay the amount of the *reasonable expenses incurred because of the violation, including a reasonable attorney fee*.

CR 26(g) (emphasis added).

Cozen emphasizes cases where courts have upheld "small punitive sanction[s] under CR 26(g)"; however, nothing within CR 26(g) limits a trial court to levy only "small" punitive sanctions. Br. of Appellant at 28. As stated above, a sanction must not be "so minimal . . . that it undermines the purpose of discovery" or allows the wrongdoer to profit from the wrong. *Fisons*, 122 Wn.2d at 356.

---

[11] While the *Fisons* court stated that "CR 11 sanctions are not appropriate where . . . other court rules more properly apply," it still examined CR 11 in its analysis of CR 26(g) based on how CR 26(g) paralleled CR 11 in its purpose. 122 Wn.2d at 339-41. Yet, as discussed above, *Mayer*, which was decided after *Fisons*, makes clear that CR 11 does not apply to CR 26 violations. 156 Wn.2d at 689.

This court very recently addressed discovery violations under CR 26(g) in *Aquatherm*, in which the trial court levied at $1.5 million sanction against Aquatherm and a $23,000 sanction against Aquatherm's attorney personally. *See generally Aquatherm*, 36 Wn. App. 2d 410. *Aquatherm* presents several similarities to the case at issue here: Aquatherm failed to identify and produce information requested during discovery. *Id.* at 417-18. One of the discovery violations was discovered on the second to last day of trial, precluding the utility of other possible sanctions such as striking claims or defenses or limiting or prohibiting evidence. *Id.* at 447. We upheld the $1.5 million sanction against Aquatherm, stating that the trial court properly considered *Fisons*' directive to levy a sanction to deter, educate, and compensate when it "impos[ed] a monetary sanction that was substantial enough to impact a large company like Aquatherm." *Id.*

While the $1.5 million discovery sanction against Aquatherm appears comparable to the $1 million sanction levied against Cozen, there are some key differences. First, the information that Aquatherm withheld during discovery was information "critical" to the issues litigated in the case. *Id.* at 435. Here, while Safelite's insurance policies were important and relevant for settlement negotiations and Jok's trial strategy, whether Safelite *had* insurance was not at issue. Indeed, Safelite's policies would not have been admissible at trial. CR 26(b)(2). Furthermore, at trial, Jok requested $25 million from the jury while under the impression that only a $5 million policy existed.

Second, in *Aquatherm*, when King County brought a motion for sanctions against Aquatherm, it sought all fees and costs related to its experts, which totaled $1.85 million. 36 Wn. App. 2d at 437. Thus, there was a compensatory element in *Aquatherm* that is not present here. Here, the $1 million is untethered to any expenses or fees Jok may have expended. Instead, the

superior court tied the $1 million sanction to the value of the insurance policies and ultimate verdict, stating that it was "1/50th of the value of the policies that were not disclosed" and it was "less than ten percent of the verdict." CP at 266. But these ratios are arbitrary.

The record suggests that Cozen may have committed other discovery abuses and violations of court orders regarding matters not on appeal here. These abuses appear to have been on the superior court's mind when it fashioned the $1 million sanction. Indeed, in his brief, Jok admits that "the trial court was not looking at a blank slate when it came to misconduct by . . . Cozen" and the sanction was based, in part, on *other* misconduct besides the failure to disclose the insurance policies. Br. of Resp't at 36. However, the other misconduct is the subject of a separate appeal; there are insufficient facts in the record in this appeal to determine whether the $1 million sanction is appropriate in light of other misconduct.[12] *See generally Jok v. Safelite Fulfillment, Inc.*, No. 60531-7-II (Wash. Ct. App). Moreover, here, the sanction was based on Cozen's violation of CR 26(g) and Lee's failure to conduct a reasonable inquiry regarding the insurance policies—not Cozen's overall misconduct during trial.

Based on the record in *this* appeal, we agree that Cozen's discovery violations warrant a significant sanction to punish Cozen for its violation and to deter future misconduct. However, under the superior court's articulated reasoning, a sanction of $2 million, $500,000, or $100,000 could all be equally appropriate to educate, deter, and punish. While the superior court considered other possible sanctions such as "default judgment" or "striking a response," both those options

[12] The appellate record contains an order excluding one of Safelite's expert witnesses based on repeated misrepresentations Cozen allegedly made to the superior court. The exclusion of that expert witness is the subject of the separate appeal. *See generally Jok v. Safelite Fulfillment, Inc.*, No. 60531-7-II (Wash. Ct. App.).

are considered "harsher" sanctions that implicate a party's ability to present its case. *Burnet*, 131 Wn.2d at 494. Thus, the superior court did not consider whether a lesser monetary sanction would suffice to educate, deter, and punish given the circumstances.

Considering the circumstances surrounding the sanction, insofar as the value of Safelite's insurance was not an issue at trial, Jok ultimately prevailed with an $11.25 million verdict, and nothing in the record shows how much Jok may have expended, a sanction of $1 million is unsupported by the record. *Mayer*, 156 Wn.2d at 684; *Fisons*, 122 Wn.2d at 343. Because it is unsupported by the record, we hold that the superior court's sanction amount of $1 million, without something more concrete or consideration of a lesser sanction, is an abuse of discretion.[13] *Magaña*, 167 Wn.2d at 582-83. Thus, we remand to the superior court to consider a sanction that is the least severe sanction that also compensates, educates, deters, and punishes, using the principles underlying *Fisons* and *Mayer* as guideposts.[14]

## C.   ATTORNEY FEES ON APPEAL

Cozen and Jok both request attorney fees and costs on appeal. Cozen simply states in its brief, "Costs on appeal should be awarded to Cozen." Br. of Appellant at 58. Jok requests fees pursuant to RAP 18.1 and CR 26(g).

---

[13] We note that if the record contained evidence that Jok expended close to $1 million for trial preparation, use of experts, or time and labor of his counsel, then a $1 million sanction may not be an abuse of discretion.

[14] Cozen also argued that the $1 million sanction was unconstitutionally severe. Courts generally avoid constitutional questions when a case can be resolved on nonconstitutional grounds. *M.G. by Priscilla G. v. Yakima Sch. Dist. No. 7*, 2 Wn.3d 786, 794, 544 P.3d 460 (2024). Because we resolve this case on nonconstitutional grounds, we do not address Cozen's constitutional argument.

Under RAP 18.1, we may award attorney fees to a party if "applicable law grants to a party the right to recover reasonable attorney fees or expenses." RAP 18.1(a). CR 26(g) provides:

> If a certification is made in violation of the rule, the court, upon motion or upon its own initiative, shall impose upon the person who made the certification, the party on whose behalf the request, response, or objection is made, or both, an appropriate sanction, which may include an order to pay the amount of the reasonable expenses incurred because of the violation, including a reasonable attorney fee.

We decline to award attorney fees and costs on appeal to Cozen. Cozen fails to devote a section of its opening brief to its request for costs, as required by RAP 18.1(b). Furthermore, "[a] party requesting fees under RAP 18.1 must provide argument and citation to authority 'to advise the court of the appropriate grounds for an award of attorney fees as costs.'" *Robinson v. Am. Legion Dep't of Wash., Inc.*, 11 Wn. App. 2d 274, 298, 452 P.3d 1254 (2019) (quoting *Stiles v. Kearney*, 168 Wn. App. 250, 267, 277 P.3d 9, *review denied*, 175 Wn.2d 1016 (2012)), *review denied*, 195 Wn.2d 1026 (2020). Cozen cites no authority, let alone RAP 18.1.

We award attorney fees and costs on appeal to Jok. CR 26(g) provides that a court may award attorney fees for certifications made in violation of the rule. For the reasons discussed in the preceding sections, Cozen clearly violated CR 26(g). Thus, we grant Jok's request for attorney fees and costs on appeal pursuant to RAP 18.1.

CONCLUSION

We affirm in part the superior court's ruling that Cozen violated CR 26(g); we reverse in part the amount of sanctions imposed, and remand to the superior court for further consideration consistent with this opinion.

No. 60685-2-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, J.

We concur:

Glasgow, J.

Veljacic, C.J.